Kennith McDOWELL, Robert Maulding, Luther Stripling, Rudy Kyle, Fred Dollar, James Joslin, James Milner, Joe Ellis, David Ellis, Daniel Stripling, and Janet Stripling, Plaintiffs,

v.

Elbert PRICE, individually and as Trustee for these plans: Bud Price's Excavating Service Inc. Profit–Sharing Plan, Bud Price's Excavating Service, Inc. Retirement Plan, Price's Utility Contractors, Inc. Retirement Plan and for six unnamed plans; Mary Ruth Price, individually and as Trustee for these plans: Bud Price's Excavating Service, Inc. Profit–Sharing Plan, Bud Price's Excavating Service, Inc. Retirement Plan, Price's Utility Contractors, Inc. Retirement Plan and for six unnamed plans (Plans A–F); Bud Price's Excavating Service, Inc. Profit–Sharing Plan; Price's Utility Contractors, Inc. Retirement Plan; Bud Price's Excavating Service, Inc. Retirement Plan; six unnamed plans (Plans A–F); Price's Utility Contractors, Inc. as plan administrator for Price's Utility Contractor's Inc., Retirement Plan and up to six unnamed plans; Bud Price's Excavating Ser-

vice, Inc. as plan administrator of Bud Price's Excavating Service, Inc. Profit–Sharing Plan, Bud Price's Excavating Service, Inc. Retirement Plan, and up to six unnamed plans (A–F), Defendants.

No. 4:08–cv–003979–SWW.

United States District Court,
E.D. Arkansas,
Western Division.

Feb. 15, 2012.

Diana McWilliams Maulding, Attorney at Law/CPA, Little Rock, AR, for Plaintiff.

Stanley D. Rauls, Attorney at Law, Little Rock, AR, for Defendants.

*ORDER*

SUSAN WEBBER WRIGHT, District Judge.

Plaintiffs Kennith McDowell, Robert Maulding, Luther Stripling, Rudy Kyle, Fred Dollar, James Joslin, James Milner, Joe Ellis, David Ellis, Daniel Stripling and Janet Stripling, former employees or beneficiaries of former employees of defendants Bud Price's Excavating Services, Inc. and Price's Utility Contractors, Inc., bring this action pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, to have their benefits under a profit sharing plan and a defined benefit plan maintained by

1. Plaintiffs have filed a notice of the death of plaintiff James Joslin and state that a motion to substitute Joplin's estate as plaintiff will be filed as soon as probate is commenced. See Document 452.

2. According to defendants, the plans are funded solely by the employer and were established

defendants determined and paid.[1] Plaintiffs challenge the manner in which both the profit sharing plan and the defined benefit plan (collectively, "the plans") were administered. Plaintiffs allege that the defendants failed to distribute the proper amounts to some plaintiffs and failed to make distributions to others, failed and refused to provide all the information and documentation required by ERISA and that such failures/refusals constituted concealment, bad faith, breach of fiduciary duties and fraud, misrepresented information provided to the plaintiffs, improperly obtained releases for distributions, failed to establish trust funds, improperly allowed an attorney, Barry Jewell, a convicted felon, to administer the plains,[2] improperly calculated distribution amounts, managed plan assets for personal gain, converted plan assets, and improperly invested plan assets. Plaintiffs request, *inter alia*, that any releases be declared void, that all benefits be recalculated and additional benefits due to plaintiffs be paid, that a full accounting be provided for each plan, and that any funds improperly taken be returned to the plans. See Document 299 (Second Amended Complaint).

Following this Court's denial of defendants' motion to dismiss plaintiffs' Amended Complaint, see Document 55, the action was referred to Magistrate Judge Henry L. Jones for further proceedings and recommendations. After issuing certain rulings, Judge Jones retired from the bench and the referral was reassigned to Magistrate Judge H. David Young.

The Court has now received findings and a recommendation ("F & R") from

lished and administered with the assistance of Jewell, a Little Rock lawyer whose practice focused primarily on employment and tax matters. Defendants note that Jewell was convicted of a felony in federal court in 2008 for acts not pertaining to this action and that his involvement with the plans was thereafter terminated.

Judge Young. See Document 450. Plaintiffs have filed objections to Judge Young's F & R. See Documents 453, 454. Defendants have not filed objections but have responded to plaintiffs' objections. See Document 456. Plaintiffs have filed a reply to defendants' response, see Document 457, and an amended reply to defendants' response "to add to p. 3 herein and to make small changes elsewhere." See Document 458. The Court has carefully reviewed *de novo* those matters to which plaintiffs have objected, see 28 U.S.C. § 636(b)(1)(C), and finds no basis for rejecting or modifying Judge Young's F & R, either in whole or in part.

Consideration of the issues in this action has been made exceedingly difficult by plaintiffs' unyielding, in many cases excessively long, and often disjointed and dispensable questioning of nearly every aspect of this action.[3] Plaintiffs' current objections to Judge Young's F & R continue that trend and, at times, reflect a misunderstanding of Judge Young's F & R. For example, plaintiffs complain that Judge Young adopted United States Department of Labor (DOL) letters that were issued following a DOL investigation into improprieties with the plans, stating that "the Magistrate's finding that what the DOL said was true is not supported by the evidence." As noted in the F & R, Elbert and Mary Ruth Price, in response to the DOL investigation, hired A. Wyckliff Nisbet, Jr. to act on their behalf and on behalf of the plans. Nisbet, in turn, obtained the services of James Turpin, an enrolled actuarial, after which Nisbet and Turpin calculated the distributions to be made to the plaintiffs from the plans. The DOL subsequently issued letters following its investigation that addressed defendants' corrective actions with respect to the violations previously outlined by the DOL. Plaintiffs claim that Judge Young adopted the DOL letters as proof of the representations set forth in those letters and that "[t]he record does not show that the DOL ascertained the correctness of the Nisbet/Turbin calculations ... thus the Magistrate's finding that what the DOL said was true is not supported by the evidence." Plaintiffs simply misunderstand Judge Young's F & R. Judge Young only set forth in the background section of his F & R what the DOL found from its investigation. He did not reference the DOL letters in addressing Nisbet's calculations, and with respect to Turpin's calculations, he specifically rejected the DOL letters as being conclusive, stating as follows:

> The defendants maintain that "[s]ince the Department of Labor reviewed and approved Turpin's calculations, it would seem apparent that the primary regulatory agency did not consider the issue to be 'egregious.'" The undersigned cannot agree. As was noted above, the Department of Labor's letter of notification reflects that "[p]articipants and beneficiaries have ... received corrected benefit calculations along with explanations of these amounts." In the context of the letter, it is more likely than not that "corrected" simply means "adjusted" as the record does not reflect that the Department of Labor considered all of the information that must be considered in calculating a benefit to be paid from a defined benefit plan.

It is clear, then, that Judge Young did not blindly adopt the substance of the DOL letters as suggested by plaintiffs.[4]

Other aspects of plaintiffs' objections to Judge Young's F & R seem rather point-

---

**3.** Plaintiffs have filed six appeals to this Court from rulings of Judges Jones and Young since

March 2010. See Documents 268, 293, 368, 382, 394, and 421.

**4.** Plaintiffs' counsel casts aspersions on Mr.

less. For example, plaintiffs take issue with Judge Young's observation that "[m]ost of the Plaintiffs were beneficiaries under [the 1997] plan" by stating "OBJECTION: All Plaintiffs are participants in the 1997 [plan] except for Plaintiffs Milner and David Ellis who both left the job prior to the inception of this plan. That is what excludes them." But isn't that the same as Judge Young saying that "[m]ost of the Plaintiffs were beneficiaries under [the 1997] plan"? The Court simply does not understand why such a passing observation would warrant an objection.

Plaintiffs also claim that Judge Young misconstrued the law and gave improper inferences to the evidence and that he "denied all discovery and refused to enforce the April 2010 discovery order." This, however, is simply false as nothing in the record shows that Judge Young misconstrued the law and gave improper inferences to the evidence, and the record shows that the plaintiffs were afforded full and fair discovery; nothing in the record shows that Judge Young (or Judge Jones) refused to enforce discovery orders.

The Court will not further burden the record by setting forth a detailed refutation of each of plaintiffs' objections (73 pages worth).[5] Suffice it to say that the Court finds that Judge Young's F & R is thorough and well-reasoned and provides a succinct, clear, and fair disposition from which this action may proceed to its conclusion. Accordingly, the Court concludes that Judge Young's F & R should be, and hereby is, approved and adopted in its entirety as this Court's findings in all respects. The motions for summary judgment filed by the plaintiffs, see Documents 318, 330, are granted in part and denied in part, and the motion for summary judgment filed by the defendants, see Document 320, is denied in full.

As set forth on the final page of Judge Young's F & R, the parties are ordered to file short briefs on the question of the application of the remedy prescribed by 29 U.S.C. § 1054(h)(6)(A). Unless directed otherwise by Judge Young (to whom this action remains referred), these briefs must be filed within fourteen (14) days of the date of entry of this Order and must not exceed five (5) pages in length.

IT IS SO ORDERED.

### FINDINGS AND RECOMMENDATION

H. DAVID YOUNG, United States Magistrate Judge.

### INSTRUCTIONS

The following findings and recommendation have been sent to United States Dis-

---

Nisbet and Mr. Turpin, stating that "Nisbet is either incompetent or he intentionally understated the benefits due Plaintiffs. The same goes for Turpin. Neither is fit to calculate a pension benefit and it is error to let the same set of incompetents/dishonest persons calculate the benefits for the accounting." Such unfounded characterizations are uncalled for.

5. As of this writing, there are 458 docket entries, a great deal of which were filed by plaintiffs. These include plaintiffs' motions to disqualify defendants' counsel, for Fed. R.Civ.P. 11 and 37 sanctions, and to hold defense counsel in contempt. The Court agrees with Judge Young that "[t]he plaintiffs' pleadings have been excessively long and con-

tain allegations that describe serious misconduct on the part of the defendants" and that "[t]he voluminous pleadings filed by the plaintiffs have been long on sweeping allegations and short on factual support." Despite the difficulties created by plaintiffs in the Court's consideration of the issues, plaintiffs prevailed in several respects. These include Judge Young's recommendations, adopted by this Court, that most of the plaintiffs are owed benefits, that a civil penalty be imposed for the plan administrators' failure to provide the eligible plaintiffs with the required information for the plans, and that the plan administrators' failure to give timely "204(h) notice" was "egregious."

trict Judge Susan Webber Wright. Any party may serve and file written objections to these findings and recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the Office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendation. The copy will be furnished to the opposing party. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The details of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court

Eastern District of Arkansas
600   West Capitol Avenue, Suite A149
Little Rock, Arkansas 72201–3325

### RECOMMENDED DISPOSITION

*INTRODUCTION.* The issues in this case revolve around a dispute over benefits owed some or all of the plaintiffs under the terms of profit-sharing and defined benefit plans created by defendants Bud and Mary Ruth Price ("Prices") and administered by defendant Bud Price's Excavating Service, Inc., ("Price's Excavating") and defendant Price's Utility Contractors, Inc. ("Price's Utility"). Viewed from a higher altitude, one can see that, beginning in 1974, the Prices took the first steps in creating accounts designed to defer income and reduce tax consequences for themselves and some of their employees. The first account the Prices established was a profit-sharing plan that provided benefits for themselves and eventually most of the plaintiffs. In 1983, the Prices created a defined benefit plan which was more attractive to them in terms of deferring a higher amount of income. Some of the plaintiffs were beneficiaries under the defined benefit plan. It is safe to say, however, that the Prices were the primary beneficiaries under the defined benefit plan. In 1997, the Prices created a second defined benefit plan. Most of the plaintiffs were beneficiaries under that plan; the Prices, though, were not beneficiaries under the plan. In 1998 or 1999, the 1983 defined benefit plan was rolled into the profit-sharing plan, and the account holding the assets of the 1983 defined benefit plan was merged with the account holding the assets of the profit-sharing plan. Thus, there remain two plans with assets to be distributed: 1) the profit-sharing plan, and 2) the 1997 defined benefit plan.

Owing, in part, to poor record keeping by the attorney initially assisting the

Prices and to their failure to provide their employees with the notices required by the Employee Retirement Income Security Act ("ERISA"), a situation was created that caused the plaintiffs to allege the profit-sharing plan and the 1997 defined benefit plan were being administered fraudulently and in violation of ERISA. This situation came to a head about the time the defendants sought to close the two plans and distribute the assets to the beneficiaries. For the first time, some of the plaintiffs learned of the existence of the plans, and the plaintiffs' subsequent investigation caused them to conclude they were not being tendered correct amounts from the two plans. The plaintiffs believed that some of them were being erroneously excluded as beneficiaries of the profit-sharing and 1997 defined benefit plans, that the calculation of benefits from the 1997 defined benefit plan was based upon an improper annuity percentage, and that the Prices had fraudulently withdrawn assets from the two plans. Additionally, the plaintiffs took issue with the Price's failure to provide the plaintiffs with the notice mandated by ERISA.

The plaintiffs' pleadings have been excessively long and contain allegations that describe serious misconduct on the part of the defendants. The voluminous pleadings filed by the plaintiffs have been long on sweeping allegations and short on factual support. It has made the completion of a recommended disposition on the pending motions for summary judgment a great challenge, and the district court was not satisfied with the undersigned's initial efforts in that regard. Additional briefing has been received and a short hearing was conducted in order to obtain clarification of the relevant issues. As will be seen below, the parties have demonstrated that no genuine dispute of material fact remains with regard to the following issues: 1) the profit-sharing and defined benefit plans under which the plaintiffs are beneficiaries; 2) the failure of the plan administrators to comply with ERISA in providing the required notices; 3) the manner of determining the amount of benefits owed the eligible plaintiffs under the profit-sharing plan; and 4) the claim that the plaintiffs were harmed by the allegedly improper withdrawals made by the Prices.

*FACTS.* Local Rule 56.1(a) requires a party moving for summary judgment to submit a "separate, short, and concise statement of the material facts as to which it contends there is no genuine issue to be tried." The parties have filed the statements required by Local Rule 56.1(a).[1] The undersigned has reviewed the statements and finds the following:

## I. PARTIES

1. The plaintiffs are former employees, and the beneficiary of a former employee, of Price's Excavating and/or Price's Utility, both of which were or are closely held corporations operated by the Prices.[2]

2. The plaintiffs do not dispute the defendants' recital of the dates during which the plaintiffs worked for the two corporations. *See* Document 441 at 1.[3]

---

1. Local Rule 56.1 does not specifically require citations to the record, but given the voluminous record in this case, citations to the record would have been extremely helpful.

2. For the sake of clarity, the undersigned will use the word "plaintiffs" to mean the employees whose interests are being litigated in this case, even though one is deceased and his interest is being litigated by his widow.

3. The plaintiffs previously offered the dates of their employment with Price's Excavating and/or Price's Utility in a series of affidavits. *See* Document 324, Exhibit Y. The minor differences between what the plaintiffs represented in those affidavits and what they have more recently agreed to is of no consequence in the resolution of this case.

3. Plaintiff Kennith McDowell worked from December 1, 1986, through December 17, 2005. *See* Document 433 at 1.

4. Plaintiff Robert Maulding worked from March 7, 1977, through September 6, 2006. *See* Document 433 at 1.

5. Plaintiff Luther Stripling worked from March 25, 1982, through November 6, 2003. *See* Document 433 at 1.

6. Plaintiff Rudy Kyle worked from June 18, 1987, through April 15, 2005. *See* Document 433 at 1.

7. Plaintiff Fred Dollar worked from November 8, 1982, through November 15, 2001. *See* Document 433 at 1.

8. Plaintiff James Joslin worked from January 23, 1996, through March 29, 2002. *See* Document 433 at 1.

9. Plaintiff James Milner worked from May 10, 1974, through October 4, 1993. *See* Document 433 at 1.

10. Plaintiff Joe Ellis worked from June 25, 1980, through February 24, 1999. *See* Document 433 at 1.

11. Plaintiff David Ellis worked from April 26, 1982, through August 26, 1992. *See* Document 433 at 1.

12. Plaintiff Daniel Stripling worked from June 14, 1999, through December 20, 2001. *See* Document 433 at 1.

13. Plaintiff Janet Stripling's deceased husband, Royce Stripling, worked from January 24, 1980, through July 26, 2002. *See* Document 433 at 1.

## II. PLANS AND PARTICIPANTS

14. In 1974, Price's Excavating began administering a profit-sharing plan ("profit-sharing plan"), a defined contribution plan for which the Prices served as trustees. *See* Document 319, Exhibit D at 406; Document 344, Proposed Findings 1, 4, 34, 100.

15. In 1983, Price's Excavating began administering a defined benefit plan ("1983 defined benefit plan"), a plan for which the Prices also served as trustees. *See* Document 324, Exhibits C, L, and P; Document 344, Proposed Findings 2, 5, 35, 101.

16. As to the classes of employees/specific plaintiffs covered under the profit-sharing plan and the 1983 defined benefit plan, the undersigned finds the following:

A. As to the classes of employees/specific plaintiffs covered under the profit-sharing plan, the defendants represent the following:

> ... The profit sharing plan originally included all employees, but it was later amended to exclude truck drivers, welders, and laborers. The profit sharing plan therefore included those employees who were not otherwise eligible under the [1983 defined benefit plan] (except for officers and clerical employees). Thus, a Utility crew member was included in the profit sharing plan.... The [1983 defined benefit plan] did not include Utility crew members (Rudy Kyle and Luther Stripling), mechanics (Kennith McDowell) and assistant supervisors (Fred Dollar, Robert Maulding and James Milner) who were all participants in the profit sharing plan....

*See* Document 433 at 1–2.

B. As to the classes of employees/specific plaintiffs covered under the 1983 defined benefit plan, the defendants represent that it only included "officers, clerical, truck drivers, welders, and laborers ..." *See* Document 433, Exhibit 1 at Paragraph 2.19. The defendants additionally represent the following:

> ... Joe Ellis and Royce Stripling, both truck drivers, and David Ellis, a sheetrock finisher (laborer), were participants in the [1983 defined benefit plan]. The Retirement plan did not include Utility crew members (Rudy

Kyle and Luther Stripling), mechanics (Kennith McDowell) and assistant supervisors (Fred Dollar, Robert Maulding and James Milner) who were all participants in the profit sharing plan. . . .

*See* Document 433 at 2.

C. With regard to James Joslin and Daniel Stripling, the defendants maintain the following:

. . . James Joslin was not included in either plan because he did not have sufficient years of service to receive a benefit before contributions to the plan ceased. Daniel Stripling was not employed before the freezing of the plans and also did not meet the age requirement.

*See* Document 433 at 2.

D. It appears that every class of employee was a participant in the profit-sharing plan until the 1983 defined benefit plan was established; at that time, the following three classes of employees were moved to the 1983 defined benefit plan: truck drivers, welders, and laborers.

E. The plaintiffs do not appear to disagree with the defendants' representations as to the classes of employees/specific plaintiffs covered under the profit-sharing plan after that event. *See* Document 355 at 4–9.

F. The undersigned finds that the following plaintiffs were covered under the profit-sharing plan: (i) Kennith McDowell, (ii) Robert Maulding, (iii) Luther Stripling, (iv) Rudy Kyle, (v) Fred Dollar, and (vi) James Milner.

G. The plaintiffs do, however, disagree with the defendants' representations as to the classes of employees/specific plaintiffs covered under the 1983 defined benefit plan. The plaintiffs maintain that they were all covered under the plan. *See* Document 441 at 1–2.

H. Accordingly, the plaintiffs do not disagree with the classes of employees encompassed within the 1983 defined benefit plan; their disagreement is with the defendants' representation as to which specific plaintiffs were covered under the plan.

I. As to that question, there is a failure of proof on the plaintiffs' part. They have failed to produce evidence to create a dispute of fact as to whom was a beneficiary under the 1983 defined benefit plan.

J. The undersigned finds that the following plaintiffs were covered under the 1983 defined benefit plan: (i) Joe Ellis, (ii) David Ellis, and (iii) the late Royce Stripling. The fact that some of the other plaintiffs may have performed work also performed by the classes of employees encompassed within the plan is of little consequence.

K. James Joslin and Daniel Stripling were covered under neither the profit-sharing plan nor the 1983 defined benefit plan.

17. In 1998 or 1999, the 1983 defined benefit plan was rolled into the Price's Excavating profit-sharing plan, and the account holding the 1983 defined benefit plan was merged with the account holding the profit-sharing plan funds. *See* Document 319, Exhibit B at 64, 130, 134–135, 163, 170–171, 182; Document 324, Exhibit K.

18. From that time forward, the merged Price's Excavating plans were administered, and commonly referred to, as the profit-sharing plan, a designation the undersigned will use throughout this Recommended Disposition.

19. The defendants represent that six of the plaintiffs are owed benefits from the profit-sharing plan, a representation the plaintiffs do not challenge. *See* Document 339 at 2; Document 355 at 4–9.

20. The undersigned finds that the following plaintiffs are actually owed benefits under the profit-sharing plan: (A) Kennith McDowell; (B) Robert Maulding; (C) Luther Stripling; (D) Rudy Kyle; (E) James Milner; and (F) Janet Stripling, on behalf of Royce Stripling. *See* Document 339 at 2.

21. In 1997, Price's Utility began administering a defined benefit plan, a plan for which the Prices served as trustees ("1997 defined benefit plan"). *See* Document 344, Proposed Findings 3, 6, 99.

22. With regard to the specific plaintiffs actually owed benefits under the 1997 defined benefit plan, the undersigned finds that the following plaintiffs are owed benefits: (A) Kennith McDowell; (B) Robert Maulding; (C) Luther Stripling; (D) Rudy Kyle; (E) Fred Dollar; (F) James Joslin; (G) Joe Ellis; (H) Daniel Stripling; and (I) Janet Stripling, on behalf of Royce Stripling. *See* Document 339 at 3; Document 355 at 10–11; Document 319, Exhibit R at 626.

23. Throughout the course of this litigation, the plaintiffs have steadfastly maintained that Price's Utility has administered, or continues to administer, six other plans, plans that the plaintiffs have failed to specifically identify. *See* Document 344, Proposed Finding 102(A). As to those unidentified plans, the undersigned finds the following:

A. The plaintiffs identify the six plans as follows:

(i) "Plan A is the second of the plans furnished and represented as being the Price's Utility ... Retirement Plan but it has a different amount of pages. Plan A is a defined benefit plan. The date of adoption is unknown...."

(ii) "Plan B is a profit sharing plan or money purchase plan as the plan gives the adopter either option and it is 91 pages long. The date of adoption is unknown."

(iii) "Plan C is a money purchase plan 94 pages long; the date of adoption is unknown."

(iv) "Plan D is a profit sharing plan 76 pages long, and the date of adoption is unknown."

(v) "Plan E is a defined benefit plan 78 pages long, and the date of adoption is unknown."

(vi) "Plan F is a defined benefit plan 62 pages long, and the date of adoption is unknown."

*See* Document 299 at 5.

B. In the plaintiffs' amended statement of material facts, they represent that the plans "relate to" the 1997 defined benefit plan, *see* Document 344, Proposed Finding 102(A), but they do not explain how the plans related to the 1997 defined benefit plan.

C. The plaintiffs have failed to produce evidence that plans "A" through "F" are indeed separate plans, and, as a result, the undersigned finds that plans "A" through "F" are not separate plans.

D. The foregoing finding is consistent with the testimony of the plaintiffs' expert witness, David Kays ("Kays"), who testified as follows:

*Plaintiff's Counsel:* Okay. Did you find any plan-I also sent you six other plans with no names or identifiers on them, did you-were you able to link any of those up with this Bud Price's Excavating Service, Inc., retirement plan.

*Kays:* Well, I think there's probably some confusion on how plan documents work, and I think that may be part of your-part of the issue. The adoption agreement is like a check list to just check off things, and then there's a base document that goes with the adoption agreement, and I suspect that some of

those other plan documents you couldn't tract are actually the base document that goes into more legalese and some definitions.

So all prototype-these are what they call prototype plans, and so you have the adoption agreement which goes through and checks various things of the plan and there's usually an associated thicker document that has-what we call the base document that has all the legalese in it, or I should say more legalese in it. And so I suspect what you're referring to may be some of those base documents. *See* Document 289 at 117.

24. Thus, there are only two plans at issue in the case at bar: the profit-sharing plan and the 1997 defined benefit plan.[4]

### III. DISCLOSURES

25. The plaintiffs knew very little about the profit-sharing plan or the 1997 defined benefit plan prior to the commencement of this litigation.

26. Kennith McDowell knew of the profit-sharing plan but knew nothing about the 1997 defined benefit plan and was provided very little information about either plan, *see* Document 319, Exhibit D at 276, Document 324, Exhibit Y at 428–429, although the record indicates the following:

A. He, along with Robert Maulding, made numerous requests from the Prices and/or their attorney for documents relating to the two plans. *See* Document 344, Proposed Findings 85–93.

B. Although Kennith McDowell and Robert Maulding were provided very little information in response to their requests, they were provided the following from Barry Jewell ("Jewell"), the Prices' attorney, in August of 2007: (1) "Form 5500 Annual Reports for [the profit-

sharing and 1997 defined benefit plans] for the last three years," (2) "Summary Annual Reports for [the plans] for the last three years," and (3) "[m]ost recent "Summary Plan Descriptions for [the plans], as well as the prior Summary Plan Description for each plan." " *See* Document 319, Exhibit F at 1.

C. Jewell's August of 2007 response to Kennith McDowell and Robert Maulding's request is also enlightening for the following representations made by Jewell:

I have acted as third party administrator for both of these plans [*i.e.*, the profit-sharing plan and the 1997 defined benefit plan] for more than twenty years, and I have maintained possession of the plan records during this time. However, I have not yet been able to locate any records for either plan prior to 2003. . . .

I believe that annual reports were delivered to each employee of both employers for every year of the existence of the plans, and it was their responsibility to keep up with the prior reports. Under ERISA, the Trustee is required to furnish you with the most current Summary Plan Descriptions and other current data, which we have done. . . .

*See* Document 319, Exhibit F at 1.

27. Robert Maulding knew of the profit-sharing plan and the 1997 defined benefit plan prior to the commencement of this litigation. He was not provided much information about either plan; in fact, he was only provided the following information about the plans:

I never got any retirement information from the Defendants while I worked there except Elbert Price gave me a benefit statement in 1979, 1980, and 1981.

---

**4.** The undersigned can understand some of the confusion the plaintiffs experienced in identifying the plans at bar. The now terminated 1983 defined benefit plan did indeed exist at one time.

...

I knew there was a profit sharing plan because Elbert Price told me there was. He never told me that there were other plans. I never knew there were other plans until my attorney told me about the Price's Utility Contractors, Inc., Retirement Plan when Barry Jewell sent the Forms 5500 for three years for it in July of 2007 and I never heard of the Bud Price's Excavating Service, Inc., Retirement Plan until my attorney got several Forms 5500 from the Department of Labor in the fall of 2008.

See Document 324, Exhibit Y at 433–434.

28. Luther Stripling was told something about a profit-sharing plan, but he was never provided any information about it; he only learned of a defined benefit plan after this litigation commenced when he received a check accompanied by "some papers." See Document 324, Exhibit Y at 430–431.

29. Rudy Kyle was told something about a plan designed for the benefit of the Prices' employees, but he was never provided any information about it; he only learned of a defined benefit plan after this litigation commenced when he received a check accompanied by "some papers." See Document 324, Exhibit Y at 419–420.

30. Fred Dollar never knew about a profit-sharing plan as he was never provided any information about it; he knew of a defined benefit plan prior to the commencement of this litigation and was provided some information about the plan when he received a check. See Document 324, Exhibit Y at 417–418.

31. James Joslin represents that he was not provided any information about the profit-sharing plan, but he was never covered under the plan. See Finding of Fact 16(K). Thus, it is of no consequence what information he did or did not receive. It is clear, though, that he was covered under the 1997 defined benefit plan, which he only learned about after this litigation commenced. See Document 324, Exhibit Y at 426–427.

32. James Milner knew about a profit-sharing plan at some point and received a benefit statement for the plan around 1974 and a check from the plan in 1994; he never knew of a defined benefit plan until after this litigation commenced. See Document 319, Exhibit D at 258–260; Document 324, Exhibit Y at 422–423.

33. It is unclear whether Joe Ellis ever knew of a profit-sharing and/or defined benefit plan prior to this litigation, although he did receive a payment from one of the plans when he stopped working. See Document 324, Exhibit Y at 410–411.

34. David Ellis knew of a profit-sharing plan, but he was never provided any information about it; he only learned of a defined benefit plan after this litigation commenced. See Document 324, Exhibit Y at 424–425.

35. Daniel Stripling represents that he never knew of any plan and was never provided any information about any plan. See Document 324, Exhibit Y at 415–416. He was never covered under the profit-sharing plan, see Finding of Fact 16(K), so it is of no consequence what information about the plan he did or did not receive. It is clear, though, that he was covered under the 1997 defined benefit plan, which he only learned about after this litigation commenced. See Document 324, Exhibit Y at 415–416.

36. Janet Stripling's knowledge of what her deceased husband, Royce Stripling, knew about the profit-sharing and defined benefit plans is understandably very cloudy; her recollection is that he knew of a profit-sharing plan but knew nothing about a defined benefit plan. She represents that save a retirement check and some "other papers," he never received "any documents related to any pension ..." See Document 324, Exhibit Y at 413.

37. Thus, prior to the commencement of this litigation, the only information other than "some papers" any plaintiff received regarding the profit-sharing plan or the 1997 defined benefit plan was as follows:

A. Kennith McDowell was provided annual reports for the profit-sharing and 1997 defined benefit plans for the three years prior to August of 2007; summary annual reports for both plans for the same period of time; and a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions. *See* Document 319, Exhibit F at 1; Document 324, Exhibit Y at 428.

B. Robert Maulding was provided a benefit statement for the profit-sharing plan for the years 1979–1981; annual reports for the profit-sharing plan and 1997 defined benefit plan for the three years prior to August of 2007; summary annual reports for both plans for the same period of time; a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions. *See* Document 319, Exhibit F at 1; Document 324, Exhibit Y at 434.

C. James Milner was provided a benefit statement for the profit-sharing plan in either 1974 or 1975. *See* Document 319, Exhibit D at 258–260; Document 324, Exhibit Y at 422–423.[5]

38. The recollection of the plaintiffs as to what they were provided by the plan administrators and/or the Prices as trustees is consistent with the Prices' deposition testimony.

39. Elbert Price admitted that he did not convey any information about the prof-it-sharing or defined benefit plans to his employees. *See* Document 319, Exhibit A at 15.

40. When asked why, he testified, "I wasn't aware I was supposed to." *See* Document 319, Exhibit A at 15.

41. Mary Ruth Price testified that the employees of Price Excavating and/or Price's Utility knew they were participants in the plans; when asked how they would have known, she answered, "By gossip." *See* Document 319, Exhibit B at 41.

42. It was not until after the commencement of this litigation that the Prices learned of their obligation to provide the participants with information about the profit-sharing and defined benefit plans. *See* Document 319, Exhibit B at 35.

43. At some point, the United States Department of Labor began an investigation into the disclosures made by the plan administrators and the Prices as trustees of the profit-sharing plan and the 1997 defined benefit plan.

44. The investigation was concluded in February of 2009, and the Department of Labor found the following with regard to the disclosures made by the profit-sharing plan administrator and trustees:

> This office has concluded its investigation of the [profit-sharing plan] and of your activities as the Plan Trustees. Based on the facts gathered during this investigation, it appears that you and Bud Price's may have breached your fiduciary obligations to the Plan and violated several provisions of ERISA. The purpose of this letter is to advise you of our findings and to give you an opportunity to comment before the Department determines what, if any, action to take.

---

**5.** He testified that "probably in 1975," he received a statement "showing how much money was in his [profit-sharing] account" and never received anything else. *See* Document 219, Exhibit D at 259.

. . .

### Failure to Disclose

The investigation revealed that Summary Plan Descriptions ("SPDs") and Summary Annual Reports ("SAR's") were not furnished to participants and beneficiaries.

It is our view that this failure to disclose plan information violated ERISA Sections 104(b)(1), (2), and (3) . . .

. . .

### Failure to Maintain Records

During the investigation, the Department requested records of contributions to the Plan, computations used to determine benefit amounts for participants and beneficiaries, and explanations of those individual benefit amounts. The Department was never provided with those records and was told much of the records have been lost. It is also our understanding that participants also requested this information but were never provided it.

It is the duty of the Plan fiduciaries to maintain Plan records and provide information concerning benefit computations to participants and beneficiaries. It is our opinion that the failure to maintain Plan records and failure to furnish this information to participants and beneficiaries violates ERISA Sections 107 and 404(a)(1)(A)(i) and (B) . . .

See Document 319, Exhibit X1 at 943–945.

45. With regard to the disclosures made by the 1997 defined benefit plan administrator and trustees, the Department of Labor made virtually identical findings.

46. The violations were corrected, and the Department of Labor was notified; on the heels of the corrective actions, a representative of the Department of Labor notified the Prices of the following with regard to the corrective actions:

It is my understanding that you and the Company have taken corrective actions with respect to the specific violations detailed in my letter of February 18, 2009. Specifically, Plan disclosures in the form of Summary Plan Descriptions and Summary Annual Reports have been provided to participants and beneficiaries and will continue to be provided as required in the future until the Plan termination is complete. . . .

Because you and the Company have taken the corrective actions described above, the Department will take no further action . . .

See Document 319, Exhibit X1 at 957.

47. With regard to the 1997 defined benefit plan, the Department of Labor made virtually identical findings. See Document 319, Exhibit X1 at 955.

## IV. ADMINISTRATION

48. The Prices never received any formal training in the administration of profit-sharing or defined benefit plans; instead, the Prices relied upon their attorneys, accountants, and investment advisors to assist in the administration of the plans. See Document 321, Affidavit of Mary Ruth Price at 1.

49. For many years, Jewell was the attorney who assisted the Prices in administering the plans. See Document 321, Affidavit of Mary Ruth Price at 1.

50. Mary Ruth Price testified that Jewell "represented the plans," "prepared all forms and notices required for the plans, and the plans always took whatever action he stated was necessary." See Document 321, Affidavit of Mary Ruth Price at 1.[6]

---

**6.** Jewell was subsequently convicted of criminal wrongdoing not related to the parties or plans involved in the litigation at bar.

51. The assets of the profit-sharing and 1997 defined benefit plans were managed by various investment managers. *See* Document 339 at 1.

52. It is a fair summation that the records of the assets held by the profit-sharing plan and the 1997 defined benefit plan, and the withdrawals/transfers of those assets, are not a model of clarity.

53. As to the assets held by the profit-sharing plan and the 1997 defined benefit plan, and the withdrawals/transfers of those assets, the undersigned finds the following:

A. The plaintiffs maintain that over the course of several years, the Prices repeatedly misappropriated assets belonging to the profit-sharing and the 1997 defined benefit plans.

B. The plaintiffs maintain that the Prices withdrew the following assets from accounts belonging to the plans:

(i) on September 17, 2004, the Prices withdrew $320,00.00 from a Charles Schwab account belonging to the profit-sharing plan;

(ii) on July 3, 2006, they withdrew $220,000.00 from the same Charles Schwab account; and

(iii) on July 3, 2006, they withdrew $220,000.00 from a Charles Schwab account belonging to the 1997 defined benefit plan.

*See* Document 344, Proposed Findings 38–39; Document 433 at 4.

C. Mary Ruth Price was questioned during her deposition about the aforementioned withdrawals, and her testimony is not very helpful. *See* Document 319, Exhibit B at 136–150.

D. In a supplement to the defendants' motion for summary judgment, the Prices do not deny making the withdrawals and maintain that their accounts in the profit-sharing and 1997 defined benefit plans were adjusted to reflect the withdrawals. *See* Document 433 at 4.

E. As to those withdrawals, the plaintiffs have failed to produce evidence to create a dispute of fact as to whether the withdrawals were improper.[7] Importantly, no evidence has been offered to demonstrate the withdrawals adversely affected the plaintiffs' accounts. The records of the profit-sharing plan show no diminution in value of the plaintiffs' accounts which could be attributed to the withdrawals, *see* Document 319, Exhibit T at 637–661, and the benefits due the plaintiffs from the 1997 defined benefit plan are actuarially determined and not impacted by disbursements to other beneficiaries, including the Prices.

F. The plaintiffs also specifically maintain that the Prices purchased real estate with assets belonging to the profit-sharing and/or the 1997 defined benefit plan. *See* Document 344, Proposed Finding 40, 109.

G. Mary Ruth Price was questioned during her deposition about the purchase, and her testimony is a bit more clear. *See* Document 319, Exhibit B at 120–123, 150–151.

H. She testified that the profit-sharing plan purchased a piece of real estate in Dallas County, Arkansas, as an investment, a piece of property she described as "timber property," *see* Document 319, Exhibit B at 121, 150, and it is the only one of the two plans to hold any real estate, *see* Document 319, Exhibit B at 150–151.

I. As to that purchase, the plaintiffs have failed to produce evidence to create

---

7. The undersigned takes no position on whether the withdrawals were proper in all respects, *e.g.,* whether the Prices complied with the requirements of the Internal Revenue Code.

a dispute of fact concerning whether the purchase was improper, at least as to whether it adversely affected the plaintiffs' accounts.[8]

J. The plaintiffs also specifically maintain that "[t]he $580,569 that went out of [the profit-sharing plan] by the end of the year [ending] October 31, 1990, and which was labeled as 'combined trusts-payable to retirement plan' never made it to [the 1997 defined benefit plan] by the end of the year [ending] October 31, 1990." *See* Document 344, Proposed Finding 48.

K. With regard to the alleged misappropriation of $580,569.00, the defendants offer the following explanation, which the undersigned adopts:

> ... the plaintiffs have alleged that loans were made because the Form 5500 for [the profit-sharing plan] reflected a $580,569 liability (Exhibit 4, page 6). However, the amount was reported on the profit sharing plan's Form 5500 as a liability to exclude assets that belonged to [the 1997 defined benefit plan] and a reciprocal liability of $225,930 was reflected on the Form 5500 for [the 1997 defined benefit plan] (Exhibit 5, page 6) to exclude assets that belonged to the [profit-sharing plan]. Therefore, both returns accurately reflected the correct net assets—$225,930 for the profit sharing plan and $580,569 for the [1997 defined benefit plan] for the plan year 1990.

*See* Document 433 at 4.

L. The plaintiffs also maintain that the records for the profit-sharing plan show the following suspicious entries:

> (i) the profit-sharing plan showed $2,621,784.00 in liabilities as of October 31, 1996, but showed no liabilities the following year even though no benefits were paid during the year ending October 31, 1996;

> (ii) the profit-sharing plan showed $2,925,667.00 being rolled over during the year ending October 31, 1999 but no plaintiff rolled over any funds during that year; and

> (iii) no plaintiff received a benefit when the defendants removed $2,946,124.00 from the 1983 defined benefit plan during the year ending October 31, 1999.

*See* Document 344, Proposed Finding 49–51.

M. Mary Ruth Price was questioned during her deposition about one or more of the aforementioned entries, and her testimony is a bit helpful. *See* Document 319, Exhibit B at 128–133.

N. Her explanation of the entries appears to be, in part, that they were made when the account holding the funds for the 1983 defined benefit plan was merged with the account holding the funds for the profit-sharing plan. *See* Document 319, Exhibit B at 130–132.

O. Although the plaintiffs steadfastly believe that the entries are evidence that the Prices misappropriated huge sums of money, there is a failure of proof on the plaintiffs' part as to that allegation. They have failed to produce evidence to create a dispute of fact concerning whether the entries were evidence of anything that adversely affected the plaintiffs' accounts.

P. The plaintiffs also make a number of other allegations regarding the Prices' alleged misappropriation of assets belonging to the profit-sharing and

---

**8.** The undersigned takes no position on whether the purchase was proper in all respects, *e.g.,* whether the Prices complied with the requirements of the Internal Revenue Code.

defined benefit plans, e.g., a $888,000.00 distribution.

Q. As to those allegations, there is a failure of proof on the plaintiffs' part. They have failed to produce evidence to create a dispute of fact concerning whether the entries allegedly manifesting the misappropriations were evidence of anything that adversely affected the plaintiffs' accounts.

54. The Department of Labor also investigated the administration of the profit-sharing and 1997 defined benefit plans; with regard to the administration of the profit-sharing plan, the Department of Labor found the following:

The investigation also revealed that in the mid–1990s, all the employees of Bud Price's were terminated at Bud Price's. The Adoption Agreement states, "Upon termination of employment (other than for early retirement, disability, or death), the participant shall be eligible to receive the vested share in plan assets as soon as administratively feasible upon termination of employment." It is our understanding that participants have requested but not received their distributions. This failure to follow the Plan documents and make distributions to terminated participants violate[d] ERISA Section 404(a)(1)(A) and (B) . . . and 404(a)(1)(D), . . .

See Document 319, Exhibit X1 at 945–946.

55. With regard to the administration of the 1997 defined benefit plan, the Department of Labor found the following:

The investigation also revealed that Price's Utility currently has six employees after a large layoff of employees in mid to late 2007. The SPD states, "If you terminate employment with the Company, you may be eligible to receive a lump sum distribution of the present value of your accrued benefit prior to reaching any early/normal retirement age. You are eligible to receive this payment any time after December 31 following your termination of employment with the company. Payment will be made in cash or in kind in a single payment." It is our understanding that participants have requested but not received their distributions. It is our opinion that this failure to follow the Plan documents and make distributions to terminated participants violate[d] ERISA Section 404(a)(1)(A) and (B) . . . and 404(a)(1)(D) . . .

See Document 319, Exhibit X1 at 950.

56. As the undersigned previously noted, the Prices took steps to correct the violations identified by the Department of Labor; their steps found favor with the Department of Labor as it subsequently notified the Prices of the following with regard to the profit-sharing plan:

It is my understanding that you and the Company have taken corrective actions with respect to the specific violations detailed in my letter of February 18, 2009. . . . Participants and beneficiaries have also received corrected benefit calculations along with explanations of these amounts. In addition, distribution packets were sent to all participants eligible for distributions. Four participants have returned their distribution packets and received distributions from the Plan totaling $29,696.75.

See Document 319, Exhibit X1 at 957.

57. With regard to the 1997 defined benefit plan, the Department of Labor made similar findings, specifically finding the following:

It is my understanding that you and the Company have taken corrective actions with respect to the specific violations detailed in my letter of February 18, 2009. . . . Participants and beneficiaries have also received corrected benefit calculations along with explanations of these amounts. In addition, distribution

packets were sent to all participants eligible for distributions. Six participants have returned their distribution packets and received distributions from the Plan totaling $213,961.96. *See* Document 319, Exhibit X1 at 955.

## V. TERMINATION AND ACCOUNTING

58. In December of 2006, the Prices asked Jewell to terminate the profit-sharing plan and the 1997 defined benefit plan. *See* Document 81, Exhibit E at 1. –28–

59. The plaintiffs did not receive notice of the intended terminations. *See* Document 344, Proposed Finding 74, 79.

60. Jewell subsequently notified the Prices that he could not terminate the plans at that time because of the then ongoing Department of Labor investigation. *See* Document 81, Exhibit E at 1.

61. During the course of that investigation, Jewell ceased acting on behalf of the Prices and the profit-sharing and defined benefit plans. *See* Document 319, Exhibit D at 392.

62. The Prices then hired A. Wyckliff Nisbet, Jr., ("Nisbet") to act on their behalf and on behalf of the plans. *See* Document 319, Exhibit D at 392.

63. Nisbet began determining the distributions owed the plaintiffs from the profit-sharing and 1997 defined benefit plans. *See* Document 319, Exhibit D at 392–393.

64. During a hearing before United States Magistrate Judge Henry L. Jones, Jr., Nisbet testified to the steps that are typically taken in determining the distributions from a profit-sharing plan and the steps he actually took in ascertaining the distributions to be made to the eligible plaintiffs from the profit-sharing plan. *See* Document 319, Exhibit D at 405–421.

65. Nisbet testified that the distributions from the profit-sharing plan were calculated and notices sent to the plaintiffs. *See* Document 319, Exhibit D at 412, 420.

66. With regard to the distributions owed some of the plaintiffs from the profit-sharing plan, the undersigned finds the following:

A. The defendants maintain that the following plaintiffs are entitled to distributions from the profit-sharing plan in the following amounts, amounts determined as of October 31, 2009:

| | |
|---|---|
| i. Kennith McDowell | $18,776.00 |
| ii. Robert Maulding | $34,692.00 |
| iii. Luther Stripling | $ 4,054.00 |
| iv. Rudy Kyle | $ 3,045.00 |
| v. James Milner | $17,402.22 |
| vi. Janet Stripling, on behalf of Royce Stripling | $38,608.00 |

*See* Document 339 at 2.

B. The plaintiffs maintain that the Nisbet's calculations are incorrect; the plaintiffs so maintain for the following reasons: (i) "Nisbet started his math by using the 1999 Jewell allocation sheets," (ii) Price withdrawals were not considered, (iii) Jewell's allocations are not consistent with the profit-sharing plan, (iv) "Nisbet did not recognize that only the Prices' benefits were frozen," (v) he did not consider "the huge liabilities that [the profit-sharing plan] showed on its Forms 5500," (vi) "[his] calculations are not correct since he made them using data only from 2002 forward," and (vii) "the allocation sheets do not match the distribution letters Jewell provided." *See* Document 356 at 5–9.

C. No genuine dispute of fact exists as to the plaintiffs' assertions of error by Nisbet. His calculations are simply based upon the amounts reflected in the plaintiffs' profit-sharing accounts. The allocation sheets for the profit-sharing plan reflect no reduction of value in any of the plaintiffs' accounts which could be attributed to the calculation errors as-

serted by the plaintiffs. *See* Document 319, Exhibit T at 637–661.

D. With regard to the benefits owed the plaintiffs in the profit-sharing plan, all that remains to be done is for the plaintiffs' accounts to be made current and distributed.

67. Nisbet also testified to the steps that are typically taken in determining the distributions from a defined benefit plan and the steps he actually took in ascertaining the distributions to be made to the eligible plaintiffs from the 1997 defined benefit plan. *See* Document 319, Exhibit D at 390–405.

68. He testified that the services of an enrolled actuarial were required; as a result, he obtained the services of James Turpin ("Turpin"). *See* Document 319, Exhibit D at 393–394.

69. Turpin prepared a calculation of the distributions owed the plaintiffs from the 1997 defined benefit plan, and Nisbet notified them of the distributions. *See* Document 319, Exhibit D at 403–404.

70. With regard to the distributions owed the plaintiffs from the 1997 defined benefit plan, the undersigned finds the following:

A. The defendants maintain that the following plaintiffs are entitled to distributions from the 1997 defined benefit plan in the following amounts, amounts determined as of September 1, 2009:

| | | |
|---|---|---|
| i. | Kennith McDowell | $ 82,231.61 |
| ii. | Robert Maulding | $116,175.33 |
| iii. | Luther Stripling | $ 84,258.44 |
| iv. | Rudy Kyle | $ 71,681.70 |
| v. | Fred Dollar | $113,416.91 |
| vi. | James Joslin | $ 91,849.90 |
| vii. | Joe Ellis | $ 1,280.77 |
| vii. | Daniel Stripling | $ 268.29 |
| ix. | Janet Stripling, on behalf of Royce Stripling | $ 27,481.99 |

*See* Document 339 at 3.

B. The plaintiffs maintain that Turpin's calculations are incorrect for the following reasons: (i) he used an incorrect percentage in making his calculations because the percentage he used, *i.e.*, 39.25 percent, is not in any version of the 1997 defined benefit plan and the correct percentage is forty-five percent; and (ii) he calculated the distributions as if the plan was at all times a defined benefit plan when, in fact, it was converted to a defined contribution plan on January 1, 2007. *See* Document 356 at 11.

C. In a supplement to the defendants' motion for summary judgment, the defendants maintain the following:

In valuing benefits under [the 1997 defined benefit plan], ... Turpin used the percentages specified in the corporate minutes of Price's Utility Contractors, Inc. (Exhibit 6). Those percentages changed annually from 1998 to 2003. ERISA Section 204(h) has always required notice to participants when an amendment significantly reduces benefit accruals under a defined benefit plan, but prior to June 7, 2001, the statutes only authorized the imposition of sanctions by the Department of Labor or the Internal Revenue Service for the failure to provide noticed.

The plaintiffs claim that they received no notice of a significant reduction in benefit accruals and that they therefore are entitled to have their benefits calculated at the highest percentage ever specified for the plan. This is based upon provisions of the ERISA Section 204(h) by EGTRRA [Economic Growth and Tax Relief Reconciliation Act of 2001] ...

The plan amendments after 6/7/01 may only be ignored if a failure to give notice is "egregious" as defined by the statute. Since the Department of Labor reviewed and approved Turpin's calculations, it would seem apparent that the primary regulatory agency did not consider the issue to be "egregious." If, however, the

Court does not consider that sufficient, questions of fact remain whether notice was actually given and, if not, whether the failure to give notice was "egregious" as statutorily defined. *See* Document 433 at 5–6.

D.   As the defendants correctly note, the percentage to be used in calculating a participant's benefits were changed several times.

E.   On January 1, 1998, the Price's Utility Board of Directors voted to change the percentage to 39.50 percent, specifically, that "[e]ach participant will receive a benefit payable at normal retirement age equal to thirty-nine and 50/100 percent (39.50%) of average annual compensation." *See* Document 433, Exhibit 6 at 2.

F.   On January 1, 1999, they voted to change the percentage to 47.50 percent. *See* Document 433, Exhibit 6 at 4.

G.   On December 31, 2000, they voted to change the percentage to forty-nine percent. *See* Document 433, Exhibit 6 at 6.

H.   On December 31, 2001, they voted to change the percentage to 38.5 percent. *See* Document 433, Exhibit 6 at 8.

I.   On December 31, 2002, they voted to change the percentage to 39.25 percent. *See* Document 433, Exhibit 6 at 10.

J.   Benefit accruals were terminated effective January 1, 2003, when Price's Utility "froze" the plan. *See* Document 433, Exhibit 6 at 12.

K.   Although there is a document in the record to suggest that the Price's Utility provided the plaintiffs with notice of at least one change to the percentage to be used in calculating a participant's benefit, *see* Document 433, Exhibit 6 at 11, there is no evidence that the Price's Utility actually provided them with that notice, notice that is typically referred to as "204(h) notice."

L.   Thus, the undersigned finds that the plaintiffs were never provided with notice of the changes to the percentage to be used in calculating their benefits.

M.   As to whether the defendants' failure to give notice was "egregious," the defendants maintain that "[s]ince the Department of Labor reviewed and approved Turpin's calculations, it would seem apparent that the primary regulatory agency did not consider the issue to be 'egregious.'" *See* Document 433 at 6.

N.   The undersigned cannot agree with the defendants' characterization of the Department of Labor's letter of notification. It reflects that "[p]articipants and beneficiaries have ... received corrected benefit calculations along with explanations of these amounts." *See* Document 319, Exhibit X1 at 955. In the context of the letter, it is more likely than not that "corrected" simply means "adjusted" as the record does not reflect that the Department of Labor considered all of the information that must be considered in calculating a benefit to be paid from a defined benefit plan. *See* Document 319, Exhibit D at 393–405.

O.   The plaintiffs additionally maintain that Turpin calculated the distributions as if the 1997 defined benefit plan was at all times a defined benefit plan when, in fact, it was converted to a defined contribution plan on January 1, 2007.

P.   There is a failure of proof on the plaintiffs' part as to that allegation. They have failed to produce evidence to create a dispute of fact concerning whether the 1997 defined benefit plan was converted to a defined contribution plan on January 1, 2007.

71.   The Prices attempted to distribute the funds they believed they owed the

plaintiffs from the profit-sharing plan and the 1997 defined benefit plan. *See* Document 339 at 2.

72. The plaintiffs refused to accept the distributions as calculated by the defendants, *see* Document 339 at 2, and this litigation ensued.

*THE FOUR COUNTS IN THE SECOND AMENDED COMPLAINT.* The plaintiffs commenced this litigation in October of 2008 pursuant to the provisions of the ERISA. In their second amended complaint, they advanced four separate counts, counts the undersigned will address individually.

## COUNT ONE–FAILURE TO PROVIDE ANNUAL PLAN FUNDING STATEMENT

■ The plaintiffs allege in count one of their second amended complaint that "the [p]lan administrator failed to provide annual plan funding statements under 29 U.S.C. 1132(a)(1)(A) and 1132(C)" to the plaintiffs covered by the plan. *See* Document 299 at 9. They allege that had they been provided with the annual plan funding statements required by 29 U.S.C. 1021(f), they would have known of, *inter alia,* the plan funding percentages, the total assets and liabilities of the plan, and any "scheduled benefit increases or reductions." *See* Document 299 at 9.

29 U.S.C. 1021(f) governs "defined benefit plan funding notices." The statute provides that "[t]he administrator of a defined benefit plan ... shall for each plan year provide a plan funding notice ... to each plan participant and beneficiary ...," *see* 29 U.S.C. 1021(f)(1). The statute identifies the information the plan funding notice must contain, information that includes the total assets and liabilities of the plan; "a statement setting forth the funding policy of the plan and the asset allocation of investments under the plan;" and in the case of a plan amendment, scheduled bene-

fit increases or reductions. *See* 29 U.S.C. 1021(f)(2). The statute does not require that the plan funding notice actually be requested; instead, the statute provides that the plan funding notice must be provided "not later than 120 days after the end of the plan year." *See* 29 U.S.C. 1021(f)(3). In the event the plan administrator fails to provide a timely plan funding notice, the court can impose a civil penalty. *See* 29 U.S.C. 1132(c).

Applying the foregoing, the undersigned begins by noting that the plaintiffs have failed to specifically identify the plan at the heart of count one; instead, they simply make reference to a plan. Because 29 U.S.C. 1021(f) references a "defined benefit plan," the undersigned finds that count one involves the 1997 defined benefit plan, not the profit-sharing plan. Although the plaintiffs maintain that there is more than one defined benefit plan, there is no genuine dispute as to that issue. The 1983 defined benefit plan was rolled into the profit-sharing plan, and the accounts holding those funds were combined. In addition, the six unidentified plans named in the second amended complaint are not separate defined benefit plans.

Kennith McDowell; Robert Maulding; Luther Stripling; Rudy Kyle; Fred Dollar; James Joslin; Joe Ellis; Daniel Stripling; and Janet Stripling, on behalf of Royce Stripling, are owed benefits under the 1997 defined benefit plan. There is no genuine dispute of fact as to whether Price's Utility, the plan administrator, provided them with timely annual plan funding notices. Save "some papers" given some plaintiffs, Kennith McDowell and Robert Maulding are the only plaintiffs who were provided any information about the plan, and the information they were provided was not provided in a timely manner.

■ What, then, of the plaintiffs' request for a civil penalty for the failure of Price's Utility to provide them with timely annual plan funding notices? The award of a penalty is within the sound discretion of the court. *See Starr v. Metro Systems, Inc.,* 461 F.3d 1036 (8th Cir.2006) [COBRA case in which defendant failed to comply with notice requirements of 29 U.S.C. 1166(a)(4) ]. *See also* 29 U.S.C. 1132(c)(1)(A). As to the imposition of a penalty, the Court of Appeals in *Starr v. Metro Systems, Inc.* offered the following guidance:

> The purpose of this statutory penalty is to provide plan administrators with an incentive to comply with the requirements of ERISA, *Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938, 948 (8th Cir.1999), and to punish noncompliance, *Chesnut v. Montgomery,* 307 F.3d 698, 704 (8th Cir.2002). In exercising its discretion to impose statutory damages, a court primarily should consider "the prejudice to the plaintiff and the nature of the plan administrator's conduct." *Kerr,* 184 F.3d at 948. Although relevant, a defendant's good faith and the absence of harm do not preclude the imposition of the 1132(c)(1)(A) penalty. *Chesnut,* 307 F.3d at 703....

*See Id.* at 1040.

The undersigned recommends that a civil penalty be imposed for the failure of Price's Utility to provide Kennith McDowell; Robert Maulding; Luther Stripling; Rudy Kyle; Fred Dollar; James Joslin; Joe Ellis; Daniel Stripling; and Janet Stripling, on behalf of Royce Stripling, with timely annual plan funding notices. As to the prejudice to the aforementioned plaintiffs, the undersigned is not convinced that it was great. There is no indication that their failure to receive timely annual plan funding notices caused them any great harm or caused them to take some action, or not take some action, they would have otherwise not taken, or taken. Nevertheless, they have been prejudiced. They were hindered in even knowing about the 1997 defined benefit plan and possessed no information that would have helped plan their years after reaching retirement age. For some of the plaintiffs, it took the commencement of litigation to learn about the 1997 defined benefit plan. As to the conduct of Price's Utility, its failure to provide the required notice was probably born out of ignorance as the Prices testified that they were not aware of their obligation to provide any information. Nevertheless, the failure of Price's Utility to provide the required notice was intentional as the Prices made no effort to educate themselves on their legal obligations as trustees.

How much of a civil penalty should be imposed? The amount of the penalty remains to be determined.[9]

## COUNT TWO–FAILURE TO PRODUCE INFORMATION TO McDOWELL AND MAULDING

In count two of the second amended complaint, the plaintiffs allege a claim that is specific to Kennith McDowell and Robert Maulding. The plaintiffs allege that between June of 2007 and September of 2008, Kennith McDowell and Robert Maulding made several requests for information about plans that were then in existence and/or plans they believe to have existed. Save limited responses in July and August of 2007 and October of 2008, the latter of which was provided by Jewell

---

**9.** The defendants maintain that "the requirements pertaining to the type of information that must be provided by [a] plan administrator[ ] and when it must be provided have changed through the years." *See* Document 361 at 3. They have failed, however, to explain how the requirements have changed or when those changes occurred.

and pertained to both the profit-sharing plan and the 1997 defined benefit plan, the plaintiffs maintain that Kennith McDowell and Robert Maulding's requests were ignored.

29 U.S.C. 1021–1031 govern the disclosure requirements of ERISA, requirements that "enable plan beneficiaries to learn their rights and obligations at any time." *See Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). The statutes provide that the plan administrator is responsible for providing information about the plan, information that includes the following: (1) a summary plan description, *see* 29 U.S.C. 1021 and 29 U.S.C. 1022; (2) the annual Department of Labor report ("5500 report"), *see* 29 U.S.C. 1023; (3) funding notices for a defined benefit plan, *see* 29 U.S.C. 1021(f); (4) a summary of the annual report for a defined contribution plan, *see* 29 U.S.C. 1024(b)(3); (5) a summary of any material modifications, *see* 29 U.S.C. 1022(a) and 29 U.S.C. 1024(b)(1); and (6) an individualized benefit statement, *see* 29 U.S.C. 1025. In the event the plan administrator fails to provide the information required by these statutes in a timely manner, the court can impose a civil penalty. *See* 29 U.S.C. 1132(c).

In applying the foregoing, it is difficult to determine from count two which plans Kennith McDowell and Robert Maulding requested information about: the profit-sharing plan, the 1997 defined benefit plan, both plans, or some other plan the plaintiffs believe to have existed. The undersigned previously found, and again finds, that there are only two plans involved in this litigation: the profit-sharing plan and the 1997 defined benefit plan. Thus, any assertion that a plan administrator failed to disclose information about a plan other than the profit-sharing plan or the 1997 defined benefit plan is without merit.

A concise summary of the information Kennith McDowell and Robert Maulding requested is difficult. Count two reflects that they requested information that is clearly encompassed by the relevant statutes, *e.g.,* plan balances, and how benefits were calculated. Count two also reflects, though, that they requested information that is clearly not encompassed by the relevant statutes, *e.g.,* the identities of "the person or persons who received the millions from the plans." *See* Document 299 at 12. In fact, the plaintiffs themselves acknowledge that the plan administrators were not required to disclose all of the information Kennith McDowell and Robert Maulding requested. *See* Document 319 at 15. Winnowing the requested information that was required to be disclosed from the requested information that was not required to be disclosed would be a daunting task were it not for one fact: the plan administrators provided very little information of any kind to Kennith McDowell and Robert Maulding and even then it was not provided in a timely manner.

It is clear that neither Price's Excavating, the plan administrator for the profit-sharing plan, nor Price's Utility, the plan administrator for the 1997 defined benefit plan, provided much information to Kennith McDowell or Robert Maulding in response to their requests. As described above, prior to the commencement of this litigation, the only information provided Kennith McDowell or Robert Maulding was as follows:

Kennith McDowell was provided annual reports for the profit-sharing and 1997 defined benefit plans for the three years prior to August of 2007; summary annual reports for both plans for the same period of time; and a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions.

Robert Maulding was provided a benefit statement for the profit-sharing plan for the years 1979–1981; annual reports for the profit-sharing plan and 1997 defined benefit plan for the three years prior to August of 2007; summary annual reports for both plans for the same period of time; a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions.

The defendants have not shown that the plan administrators for the profit-sharing plan and the 1997 defined benefit plan provided Kennith McDowell or Robert Maulding with any other information. Thus, save the information noted above, there is no genuine dispute of fact as to whether they were provided any information prior to the commencement of this litigation. They were not.

What, then, of the plaintiffs' request for a civil penalty for the plan administrators' failure to provide Kennith McDowell and Robert Maulding with the information they requested and were entitled to receive in a timely manner under ERISA? As the undersigned has noted, the award of a penalty is within the sound discretion of the court and requires the court to consider such factors as the prejudice to the plaintiffs and the nature of the plan administrator's conduct. *See Starr v. Metro Systems, Inc., supra.* The undersigned recommends that a penalty be awarded for the reasons outlined above. *See supra,* at 39. In short, although Kennith McDowell and Robert Maulding suffered only minimal prejudice, they did suffer prejudice. Also, the misconduct of the plan administrators was intentional.

How much of a civil penalty should be imposed? The amount of the penalty remains to be determined.[10]

## COUNT FOUR–FAILURE TO INFORM

The plaintiffs allege in count four of their second amended complaint that the plan administrators failed to disclose any information about the plans, a count the plaintiffs maintain "applies to all nine plans." *See* Document 299 at 38. The count mirrors counts one and two and provides that they were not provided such things as summary plan descriptions, annual reports, and notice of any plan modifications.

As a preliminary matter, the undersigned again finds that there are only two plans involved in this litigation: the profit-sharing plan and the 1997 defined benefit plan. Thus, any assertion that a plan administrator failed to disclose information about a plan other than the profit-sharing plan or the 1997 defined benefit plan is without merit.

Winnowing the information in count four that the plan administrators were required to furnish in a timely manner from the information they were either under no obligation to provide or provided at some later date would be a daunting task were it not for one fact: the plan administrators provided very little timely information. As described above, the only information, other than "some papers," any plaintiff was provided was as follows:

Kennith McDowell was provided annual reports for the profit-sharing and 1997 defined benefit plans for the three years prior to August of 2007; summary annual reports for both plans for the

**10.** The defendants maintain that "the requirements pertaining to the type of information that must be provided by [a] plan administrator[ ] and when it must be provided have changed through the years." *See* Document 361 at 3. They have failed, however, to explain how the requirements have changed or when those changes occurred.

same period of time; and a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions.

Robert Maulding was provided a benefit statement for the profit-sharing plan for the years 1979–1981; annual reports for the profit-sharing plan and 1997 defined benefit plan for the three years prior to August of 2007; summary annual reports for both plans for the same period of time; a current, as of August of 2007, Summary Plan Descriptions for both plans, as well as prior Summary Plan Descriptions.

James Milner was provided a benefit statement for the profit-sharing plan around 1974.

The remaining plaintiffs were provided nothing. There is no genuine dispute of fact as to whether the plaintiffs were provided with the information in count four required by ERISA and were provided it in a timely manner. They were not.

What, then, of the plaintiffs' request for a civil penalty for the plan administrators' failure to provide the plaintiffs with the information in count four they were entitled to receive in a timely manner under ERISA? As with their request for a penalty under counts one and two, the undersigned recommends that a penalty be awarded because Price's Excavating provided the plaintiffs with virtually no timely information about the profit-sharing plan and Price's Utility provided them with virtually no timely information about the 1997 defined benefit plan. Some of the plaintiffs did not know they were even beneficiaries of one or both of the plans until after this litigation commenced. The amount of that penalty remains to be determined.[11]

## COUNT THREE–EQUITABLE RELIEF

In count three of the second amended complaint, the plaintiffs maintain that the assets of the two plans were mismanaged and/or misappropriated and that plans "A" through "F" were fraudulently concealed. The plaintiffs seek, inter alia, an accounting.

As a preliminary matter, the undersigned again finds that there are only two plans involved in this litigation: the profit-sharing plan and the 1997 defined benefit plan. Any assertion that a defendant having a fiduciary duty fraudulently concealed the existence of a plan is without merit.

29 U.S.C. 1102(a) provides that a fiduciary is anyone who has authority to control and manage the operation and administration of a plan. The standard of care required of a fiduciary is that of a prudent man. *See* 29 U.S.C. 1104. 29 U.S.C. 1109(a) governs a fiduciary's liability for breaching his duty. The statute provides, in part, the following:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary . . .

Applying the foregoing, the undersigned begins by noting that the Prices serve as fiduciaries for the only two plans involved in this litigation: the profit-sharing plan and the 1997 defined benefit plan. Did the

---

**11.** The defendants maintain that "the requirements pertaining to the type of information that must be provided by [a] plan administrator[] and when it must be provided have changed through the years." *See* Document 361 at 3. They have failed, however, to explain how the requirements have changed or when those changes occurred.

Prices breach the fiduciary duties they owed the plaintiffs as participants and/or beneficiaries of those two plans? Although the plaintiffs have clearly demonstrated that the Prices failed to provide the information required by ERISA in a timely manner, and in fact largely provide no information about the plans, and were poor record-keepers, there is no dispute of fact as to whether the Prices breached a fiduciary duty owed the plaintiffs as participants and/or beneficiaries of the two plans.

With regard to the Prices' withdrawals, the plaintiffs have failed to produce evidence to create a dispute of fact as to whether the withdrawals were improper. Importantly, no evidence has been offered to demonstrate the withdrawals adversely affected the plaintiffs' accounts. The records of the profit-sharing plan show no diminution in value of the plaintiffs' accounts which could be attributed to the withdrawals, and the benefits due the plaintiffs from the 1997 defined benefit plan are actuarially determined and not impacted by disbursements to other beneficiaries, including the Prices.

With regard to the Prices' purchase of real estate with assets belonging to the profit-sharing and/or the 1997 defined benefit plan, the plaintiffs have failed to produce evidence to create a dispute of fact concerning whether the purchase was improper. Importantly, there is no evidence that the purchase adversely affected their accounts.

With regard to the Prices' alleged misappropriation of $580,569.00, the undersigned adopts the defendants' explanation of that entry on their books, which was as follows:

the amount was reported on the profit sharing plan's Form 5500 as a liability to exclude assets that belonged to [the 1997 defined benefit plan] and a reciprocal liability of $225,930 was reflected on the Form 5500 for [the 1997 defined benefit plan] (Exhibit 5, page 6) to exclude assets that belonged to the [profit-sharing plan]. Therefore, both returns accurately reflected the correct net assets-$225,930 for the profit sharing plan and $580,569 for the [1997 defined benefit plan] for the plan year 1990.

*See* Document 433 at 4.

With regard to the allegedly suspicious entries in the records for the plans, there is a failure of proof on the plaintiffs' part as to that allegation. They have failed to produce evidence to create a dispute of fact concerning whether the entries were evidence of anything that adversely affected the plaintiffs' accounts.

The plaintiffs also make a number of other allegations regarding the Prices' alleged misappropriation of assets. As to those allegations, there is a failure of proof on the plaintiffs' part. They have failed to produce evidence to create a dispute of fact concerning whether the entries allegedly manifesting the misappropriations were evidence of anything that adversely affected the plaintiffs' accounts.

What, then, of the accounting demanded by the plaintiffs? The defendants maintain that they have provided the plaintiffs with an accounting of their interests in the profit-sharing plan and the 1997 defined benefit plan. The defendants are correct; the accounting for the profit-sharing plan was prepared by Nisbet, and the accounting for the 1997 defined benefit plan was prepared by Turpin. The question is whether the accountings are correct.

As to the profit-sharing plan, no genuine dispute of fact exists as to the plaintiffs' assertions of error by Nisbet. His calculations are simply based upon the amounts reflected in the plaintiffs' profit-sharing accounts. The allocation sheets for the profit-sharing plan reflect no reduction of value in any of the plaintiffs' accounts

which could be attributed to the calculation errors asserted by the plaintiffs. All that remains to be done is for the plaintiffs' accounts to be made current and distributed.

As to the 1997 defined benefit plan, the parties' dispute centers upon whether Turpin used the correct percentage in making his benefits calculations. The defendants maintain that he used a percentage, that being, 39.25, that was approved by the Price's Utility Board of Directors on December 31, 2002, which was also the last percentage approved by the Board of Directors as benefit accruals were terminated effective January 1, 2003, when the 1997 defined benefit plan was "frozen." The plaintiffs maintain, in response, that they never received notice of the many changes to the percentage to be used to calculate benefits under the 1997 defined benefit plan and, as a result, the highest such percentage should be used in calculating their benefits under the plan.

■ The undersigned again finds that Price's Utility, the plan administrator, did not provide the plaintiffs with the required "204(h) notice," that is, Price's Utility did not provide notice of the changes to the percentage to be used in calculating their benefits under the 1997 defined benefit plan. Although there is a document in the record to suggest that Price's Utility provided them with notice of at least one change, there is no evidence that Price's Utility actually provided them with that notice. Was the failure of Price's Utility "egregious?" The answer to that question is important because of the provisions of 29 U.S.C. 1054(h)(6), which provides, in full, the following:

(A) In the case of any egregious failure to meet any requirement of this subsection with respect to any plan amendment, the provisions of the applicable pension plan shall be applied as if such plan amendment entitled all applicable individuals to the greater of—

(i) the benefits to which they would have been entitled without regard to such amendments, or

(ii) the benefits under the plan with regard to such amendment.

(B) For purposes of subparagraph (A), there is an egregious failure to meet the requirements of this subsection if such failure is within the control of the plan sponsor and is-

(i) an intentional failure (including any failure to promptly provide the required notice or information after the plan administrator discovers an unintentional failure to meet the requirements of this subsection),

(ii) a failure to provide most of the individuals with most of the information they are entitled to receive under this subsection, or

(iii) a failure which is determined to be egregious under regulations prescribed by the Secretary of the Treasury.

Applying the foregoing, the undersigned finds that the failure of Price's Utility to provide the plaintiffs with the required "204(h) notice" was "egregious." The undersigned so finds for two reasons. First, the failure of Price's Utility to provide the required notice was probably born out of ignorance as the Prices testified that they were not aware of their obligation to provide any information. Nevertheless, the failure of Price's Utility to provide the required notice was intentional as the Prices made no effort to educate themselves on their legal obligations as trustees. *See Jensen v. Solvay Chemicals, Inc.*, 788 F.Supp.2d 1278 (D.Wyo.2011) (meaning of intentional does not require maliciousness). They instead depended upon others to their own peril.

Second, Price's Utility failed to provide most of the plaintiffs with most of the information they were entitled to receive. *See Brady v. Dow Chemical Co. Retirement Board,* 311 Fed.Appx. 626 (4th Cir. 2009) ("most" means "greatest number of" or "the majority of"). In fact, Price's Utility provided no "204(h) notice" to any of the plaintiffs.

The defendants maintain that "[s]ince the Department of Labor reviewed and approved Turpin's calculations, it would seem apparent that the primary regulatory agency did not consider the issue to be 'egregious.'" The undersigned cannot agree. As was noted above, the Department of Labor's letter of notification reflects that "[p]articipants and beneficiaries have … received corrected benefit calculations along with explanations of these amounts." In the context of the letter, it is more likely than not that "corrected" simply means "adjusted" as the record does not reflect that the Department of Labor considered all of the information that must be considered in calculating a benefit to be paid from a defined benefit plan.[12]

Having found that the failure of Price's Utility to provide the plaintiffs with the required "204(h) notice" was "egregious," the undersigned turns to the remedy prescribed by 29 U.S.C. 1054(h)(6)(A). It provides that the applicable individuals, *i.e.,* the plaintiffs owed benefits under the 1997 defined benefit plan, are entitled to the greater of "(i) the benefits to which they would have been entitled without regard to such amendments, or (ii) the benefits under the plan with regard to such amendment."

The parties' briefs on the aforementioned question are not helpful. The plaintiffs simply maintain that they are entitled

to benefits calculated using the highest percentage approved by the Price's Utility Board of Directors, that being, the percentage approved on December 31, 2000. It provided the following: "Each participant will receive a benefit payable at normal retirement age equal to forty-nine percent (49%) of average annual compensation." The plaintiffs failed, however, to support their position with a meaningful citation to authority. The parties should be ordered to prepare *short* briefs on the question of the application of the remedy prescribed by 29 U.S.C. 1054(h)(6)(A).

*RECOMMENDATION.* The undersigned recommends that the plaintiffs' motions for summary judgment be granted in part and denied in part and the defendants' motion for summary judgment be denied in full. No genuine disputes of fact remain with regard to the following issues:

1) the profit-sharing and defined benefit plans under which the plaintiffs are beneficiaries. There are only two plans involved in this litigation: the profit-sharing plan and the 1997 defined benefit plan. The following plaintiffs are owed benefit under the profit-sharing plan: (A) Kennith McDowell; (B) Robert Maulding; (C) Luther Stripling; (D) Rudy Kyle; (E) James Milner; and (F) Janet Stripling, on behalf of Royce Stripling. The following plaintiffs are owed benefits under the 1997 defined benefit plan: (A) Kennith McDowell; (B) Robert Maulding; (C) Luther Stripling; (D) Rudy Kyle; (E) Fred Dollar; (F) James Joslin; (G) Joe Ellis; (H) Daniel Stripling; and (I) Janet Stripling, on behalf of Royce Stripling.

2) the failure of the plan administrators to comply with ERISA in providing the required notices and information. As to count one, the eligible plaintiffs did not

---

**12.** Price's Utility is also not entitled to the protection afforded by the good faith, safe harbor exception noted in *Brady v. Dow Chemical Co. Retirement Board, supra.*

receive timely plan funding notices for the 1997 defined benefit plan. As to count two, Kennith McDowell and Robert Maulding were not provided timely information about the profit-sharing plan or the 1997 defined benefit plan. As to count four, the eligible plaintiffs were not provided with the ERISA-required information identified in that count. With specific regard to the 1997 defined benefit plan, the plan administrator's failure to give timely "204(h) notice" was "egregious."

3) the manner of determining the amount of benefits owed the eligible plaintiffs under the profit-sharing plan. As to count three, the following plaintiffs were owed benefits in the following amounts from the profit-sharing plan as of October 31, 2009: (A) Kennith McDowell, $18,776.00; (B) Robert Maulding, $34,692.00; (C) Luther Stripling, $4,054.00; (D) Rudy Kyle, $3,045.00; (E) James Milner, $17,402.22; and (F) Janet Stripling, on behalf of Royce Stripling, $38,608.00. All that remains to be done is for the plaintiffs' accounts to be made current and distributed.

4) the claim that the plaintiffs were harmed by the allegedly improper withdrawals made by the Prices. The plaintiffs have failed to produce evidence to create a dispute of fact concerning whether the entries allegedly manifesting the misappropriations were evidence of anything that adversely affected their accounts.

Several other matters in this case remain to be resolved. Those matters include the following:

A. the amount of the civil penalty to be imposed for the plan administrators' failure to provide the eligible plaintiffs with the required information for the profit-sharing and 1997 defined benefit plans.

B. although it is clear which plaintiffs are owed benefits under the 1997 defined benefit plan, it is not clear which percentage should be used to calculate their bene-fits. Although the plan administrator's failure to give timely "204(h) notice" was "egregious," it is not clear whether the plaintiffs owed benefits are entitled to the highest percentage ever adopted by the Price's Utility Board of Directors. The parties should be ordered to prepare *short* briefs on the question of the application of the remedy prescribed by 29 U.S.C. 1054(h)(6)(A).

DATED this 10th day of January, 2012.